# THE PEOPLE OF THE STATE OF ILLINOIS
## *v.*
## TOBIAS S. BRADLEY *et al.*

1.  TAXATION BY THE STATE—*origin of the power.*  The power of taxation by the States was not derived from, nor does it depend upon the federal government, and may be exercised without limit upon all persons and property within the State, except so far as it is restricted by the federal Constitution.

2.  SAME—*how far restricted by the federal Constitution.*  The federal Constitution limits the power of taxation by a State in express terms as to imports and exports, and by implication, as to those instruments employed by the general government to carry out its authority, and the operation of such instruments ; but it in no wise prohibits the taxation of the property of those instruments.

3.  TAXATION OF NATIONAL BANK STOCK *by the State.*  The bonds of the federal government are instruments used in aid of its authority, and cannot be taxed ; but when converted into bank stock, such stock becomes the property of those instruments, and represents the interest of the particular shareholder owning such stock, and is subject to taxation by the State.

4.  The shares of stock held by a person in the capital stock of a national bank, constitute his interest in the bank, and such interest is liable to assessment and taxation under the laws of the State.    It is a subject over which the

sovereign power of the State extends, and this power exists by virtue of authority inherent in the State itself, and cannot be directed or controlled in its exercise by the general government.

5. TAXATION—*must be equal and imposed according to value.* Under the Constitution and laws of this State, the rate of taxation as to every species of taxable property must be equal, and must be imposed according to value.

6. SAME—*as between State and national banks.* The shares of stock in our State banks are liable to taxation, without regard to the character of the bonds deposited with the auditor; and, as between these banks and national banks, the rate of taxation is the same, and such equality is not affected by the fact that the taxes are assessed against the corporation in the case of State banks, and against the individual stockholder in the case of national banks.

7. The term "investment in stocks," used in the tenth section of the revenue law of 1853, embraces within its meaning shares in the capital stock of banks and banking associations, and includes as well shares in the capital stock of national banks.

8. Mr. JUSTICE LAWRENCE concurs in the decision of this case, but not in all of the propositions expressed in the opinion of a majority of the court. His concurrence is based upon these considerations: The bonds issued by the general government are not taxable by the State; but that government had the clear right, which it exercised in the banking law, passed by congress, June 3, 1864, in offering the holders of these bonds the privilege of making them the basis of banking, to annex to the exercise of this franchise the condition that the shares of bank stock created under the act should be subject to State taxation. Not that this was a grant of power to the State, but conceding that the government had the power to exempt this stock from State taxation, yet it explicitly disclaims the intent to do so. Such bondholders as seek to exercise this franchise must do so subject to the condition on that subject.

This cause was brought into this court, by the auditor of the State, under the provision of section thirty-three, of the act of 1863, relating to the assessment of property in counties adopting the township organization. The cause comes up from Peoria county, and the facts in the case are fully stated in the opinion of the court.

Messrs. HAY & CULLOM, for the auditor.

Messrs. McCOY & PRATT, and Mr. J. M. WALKER, for the defendants.

Mr. CHIEF JUSTICE WALKER delivered the opinion of the Court:

It appears from the record in this case, that the assessor for the town of Peoria, assessed the shareholders of the first and second national banks in the city of Peoria, for taxation in the year 1865, on all of the shares severally held by them, at their par value. At the annual meeting of the board of supervisors of the county held in the following September, defendants in error, for themselves and the other shareholders, appeared before the board and applied to have these assessments abated, and stricken from the assessment roll, upon the ground that such shares were not liable to be taxed, under or by virtue of State authority. On the hearing of the application, it was proved that these banks were organized in the year 1863. That as fast as the banks received their capital stock from the shareholders, or profits were accumulated, both the capital and the profits were invested in bonds of the United States government, issued under the act of congress of the 25th of February, 1862, and that they remained thus invested.

That on the third day of June, 1864, and previous to the passage of the national banking law of that date, the entire capital and profits of these banks were permanently invested in such bonds. On this evidence, the board of supervisors, being of the opinion that these shares were not subject to State taxation, granted the application, and ordered the entire assessment to be stricken from the roll of taxable property. The clerk of the County Court, thereupon certified the record and proceedings, with the order entered by the board of supervisors, to the auditor of public accounts for his approval. The auditor, however, disapproving of the action of the board, brings the case to this court for determination.

The exemption claimed for these shares from taxation is based upon the ground, that these banks are instruments, created and employed by the general government to carry into effect the purposes for which it was organized. And in support of this position the cases of *McCulloch* v. *The State of*

*Maryland*, 4 Wheat. 316, and *Osborn* v. *The United States Bank*, 9 Wheat. 738, are referred to as decisive of the question. The first of these cases arose upon a prosecution under a statute · of the State of Maryland, imposing a fine upon the officers of the bank, for issuing bills without paying a specific tax on each, fixed by the act.    The payment of this tax was refused, and a prosecution was instituted for the recovery of the penalty, and the case was eventually taken to the Supreme Court of the United States and determined.    The court held that, as the United States Bank was created by the general government, and employed as an instrument which was proper and necessary to carry into effect the powers of government, neither it nor its operations were liable to taxation by State authority.

In the case of *Osborn* v. *The United States Bank*, the court reviewed their former decision.    They in that case held that, whilst the general government is powerless to create a private corporation for the transaction of private trade or business, it has the power to create a bank, to be employed as a fiscal agent of the government, as its primary object, and that if, in doing so, banking powers are conferred, by which profits inure to the shareholders, by banking and other operations incident to such institutions, that will not change its character.    And the court say : " The whole opinion of the court, in the case of *McCulloch* v. *The State of Maryland*, is founded on and sustained by the idea that the bank is an instrument which is " necessary and proper for carrying into effect the powers vested in the government of the United States."    The court also say that, a " mere private corporation, engaged in its own business, with its own views, would certainly be subject to the taxing powers of the State, as any individual would be ; and the casual circumstance of its being employed by the government in the transaction of its fiscal affairs, would no more exempt its private dusiness from the operation of that power than it would exempt the private business of any individual employed in the same manner."

In the case of *McCulloch* v. *The State of Maryland*, it is said that, " in America the powers of sovereignty are divided

between the government of the Union and those of the States. They are each sovereign with respect to the objects committed to it, and neither sovereign with respect to the objects committed to the other." And the court further say, " that the power of taxation is one of vital importance ; that it is retained by the States ; that it is not abridged by the grant of a similar power to the government of the Union ; that it is to be concurrently exercised by the two governments, are truths which have never been denied. But such is the paramount character of the Constitution, that its capacity to withdraw any subject from the action of even this power is admitted. The States are expressly forbidden to lay any duties on imports or exports, except what may be absolutely necessary for executing their inspection laws. If the obligation of this prohibition must be conceded—if it may restrain a State from the exercise of the taxing power on imports and exports, the same paramount character would seem to restrain, as it certainly may restrain, a State from such other exercise of this power as is in its nature incompatible with and repugnant to the constitutional laws of the Union.

" It is admitted that the power of taxing the people and their property is essential to the very existence of government, and may be legitimately exercised, on the objects to which it is applicable, to the utmost extent to which the government may choose to carry it. The only security against the abuse of this power is found in the structure of the government itself. In imposing a tax, the legislature acts upon its constituents. This is, in general, a sufficient security against erroneous and oppressive taxation.

" The people of a State, therefore, give to their government a right of taxing themselves and their property, and, as the exigencies of government cannot be limited, they prescribe no limits to the exercise of this right, resting confidently on the interest of the legislator, and on the influence of the constituents over their representatives, to guard them against its abuse.  *  *  *   It may be objected, to this definition, that the power of taxation is not confined to the people and property

of a State. It may be exercised upon every object brought within its jurisdiction. This is true. But to what source do we trace this right? It is obvious that it is an incident of sovereignty, and is co-extensive with that to which it is an incident. All subjects over which the sovereignty of a State extends are subject to taxation, but those over which it does not extend are, upon the soundest principles, exempt from taxation.

" If we measure the power of taxation, residing in a State, by the extent of sovereignty which the people of a single State possess, and can confer on its government, we have an intelligible standard, applicable to every case to which the power may be applied. We have a principle which leaves the power of taxing the people and property of a State unimpaired, which leaves to a State the command of all its resources, and which places beyond its reach all those powers which are conferred by the people of the United States on the government of the Union, and all of those means which are given for the purpose of carrying those powers into execution."

The court also say, " That the power to tax involves the power to destroy; that the power to destroy may defeat and render useless the power to create; that there is a plain repugnance in conferring on one government the power to control the constitutional measures of another, which other, with respect to these very measures, is declared to be supreme over that which exercises the control; are propositions not to be denied."

The court again say : " If the States may tax one instrument employed by government, in the execution of its powers, they may tax any and every other instrument. They may tax the mail; they may tax the mint; they may tax patent rights; they may tax the papers of the custom-house; they may tax judicial process; they may tax all the means employed by the government to an excess which would defeat the ends of government. This was not intended by the American people. They did not design to make the government dependent on the States."

After having determined the case, by a chain of the most masterly reasoning, and arriving at a unanimous conclusion,

which has ever since been acquiesced in by the whole country, and to avoid all misconstruction, and to remove every doubt, the court add at the conclusion of the opinion a qualification. Chief Justice MARSHALL says: "This opinion does not deprive the States of any resources which they originally possessed. It does not extend to any tax paid by the real property of the bank in common with 'other real property within the State; nor to a tax imposed on the interest which the citizens of Maryland may hold in this institution, in common with other property of the same description throughout the State. But this is a tax on the operations of the bank, and is consequently a tax on the operations of an instrument employed by the government of the Union to carry its operations into effect."

It is truly said that the powers of sovereignty are divided between the government of the Union, and those of the States. Neither has a controlling power over the other, when exercising authority possessed by them. The States do not derive their powers from the general government, but from the people, and the federal government all of its authority from the national Constitution. And when power has been bestowed upon one, it is completely out of the reach of the other. The sovereignty of each is absolute and completely independent of the other whilst acting within the scope of their authority. Nor when acting concurrently do they exercise the same powers, but their authority is separate and distinct. They may no doubt exercise similar power over the same object, but each exercises a totally distinct authority for different purposes, and to accomplish different ends. The general government acts under the federal Constitution, and to carry out the authority delegated to it, whilst the States act under the powers reserved to them, and not conferred upon the general government. The federal government is only supreme within the limits, yet to the full extent, of the powers granted.

The Supreme Court in these opinions assert, and with an undivided bench, that the power of taxation was retained by the States, and was not abridged by the grant of similar authority to the general government, and that such power may be con-

currently exercised by both governments; and that the proposition is so plain that its truth had never been denied. It then follows that the States may exercise this power without limit or control by the general government, upon all persons and property within the limits of the State, except in so far as they have been limited in its exercise by the federal Constitution. And it has been seen that the Constitution of the United States has, in express terms, limited it as to imports and exports, and by implication, in reference to the instruments employed by the federal government to carry out the authority of the government of the Union and the operations of those instruments. But it has failed by the use of terms or by implication to prohibit the taxation of the property of those instruments. .

On the contrary, the Supreme Court of the United States, we have seen, expressly held that such property may be taxed by virtue of State authority. And when they say that the interest which citizens hold in the United States banks may be taxed, they obviously refer to shares of the capital stock held by individuals. And the language manifestly embraces more than shares of stock, and was used for that very reason. It was designed to embrace dividends, profits, and any thing the citizen held in the bank, which was the proper subject of taxation, let it consist of what it might. And the term stock or shares was undoubtedly avoided to prevent an inference that they designed to limit the power to such an interest. What the court says renders it as clear that they intended to announce that shares in the capital stock of the bank might be taxed by the State as if they had said so in terms. And this is so obvious that counsel, in their able and elaborate arguments, do not pretend to confine the language to any other interest. And it may be asked how, by the known rules of interpretation, shares of stock can possibly be excluded from the language employed. And that shares in the capital stock of a bank are an interest in a bank is so plain a proposition that it may be comprehended by any mind. It cannot be rendered plainer by any process of reasoning or illustration, but seems to us to be entirely self-evident.

Again, if we apply the test adopted by the Supreme Court, that all subjects over which the sovereign power of a State extends are objects of taxation, no one will deny, when these shares were made personal property, that they became the objects of legislation, of adjudication, and subject to the laws of descent and distribution on the death of the owner. Nor will it be contended that the legislature of a State has not the power to alter and entirely change the rule of descent as far as might be applicable to them, or that courts of equity in the States would be powerless to compel a specific performance of an agreement for a sale of such shares, and, if this be so, then the sovereign power of the State undeniably extends to them, and they are manifestly within the rule announced by the Supreme Court of the United States. So far, then, from these cases establishing the position that the States are powerless to tax shares in these national banks, we regard them as conclusive that they may tax them, and this, too, by virtue of the authority inherent in the States themselves, and not by virtue of authority conferred by congress, or by permission of that body, or under its direction or control.

It was insisted that the proviso in the forty-first section of the act creating these banks does not confer the power. That proviso is this: "*Provided*, that nothing in this act shall be construed to prevent all the shares in any of the said associations, held by any person or body corporate, from being included in the valuation of the personal property of such person or corporation in the assessment of taxes imposed by or under State authority at the place where such bank is located, and not elsewhere, but not at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such State: *provided, further*, that the tax so imposed under the laws of any State upon the shares of any of the associations authorized by this act, shall not exceed the rate imposed upon the shares in any of the banks organized under authority of the State where such association is located: *provided, also*, that nothing in this act shall exempt the real estate of associations from either State, county or municipal taxes to

the same extent, according to the value, as other real estate is taxed."

It will be observed that it does not profess to confer the power, but recognizes it as already existing in the States. And it disclaims all intention to deprive the States of the right to tax these shares. And the language in the proviso, which purports to direct and control the exercise of the power, as we have seen, is entirely inoperative when tested by the principles announced by the Supreme Court in the cases above referred to ; and as the right to tax by the States is an independent power, and may be exercised without the control of the general government, this proviso confers no authority, nor does it abridge any, but is simply nugatory and inoperative.

We may apply the reasoning of the Supreme Court in those cases to the exercise of the taxing power of the States with the same force and with equal justice as to the general government. A moment's reflection will show that the principle there announced and applied is, in every respect, as applicable in the one case as in the other. If the right were conceded to the general government to limit or control taxation in the States, it would involve the power to prohibit their collection ; and the power to prohibit involves the authority to render the power to raise the revenue necessary for the support of the State government useless, if not impossible. That there would be a plain repugnance in retaining this power in the State governments, and in conferring authority on the federal government to control the exercise of such a right, is a proposition that cannot be denied. And, although the power to control does not necessarily destroy, and, if carried to an excess, would be an abuse of authority which would destroy all confidence in government, and which need never be apprehended ; still, this is a question of power and not one of its prudent and just use.

We may, also, with equal force and propriety, apply the reasoning of Chief Justice MARSHALL to the want of power in the federal government to limit and control the objects and the rate of taxation. If it may say that the owner of shares in

such banks shall not be taxed at their value by a State, or if so taxed, that they shall only bear a specific rate, they may say the same of any and every other article subject to taxation. They may say the same of real or personal property, of money, of merchandise, of notes, of bills, mortgages, stocks in banks, insurance companies, and, in a word, of every species of property always recognized as the proper and legitimate objects of taxation. The American people never supposed that they had granted such vast and unlimited powers to the general government, when they adopted the federal Constitution. They designed that the two governments should be and remain co-existent. That neither should be armed with authority to destroy the other. And although separate and distinct in their workings, each was regarded as equally necessary for the promotion of the happiness of the people, and to secure them in the enjoyment of life and the blessings of liberty and personal security.

Under our Constitution, and of course under our revenue laws, the rate of taxation must be equal, and must be imposed according to value, and this, too, in regard to every species of taxable property. So, if the second proviso of the act of congress could have any binding force, it would be inapplicable under our revenue system. And, if it could be conceded that it was binding on State authority, the rigid construction contended for by counsel would not be consonant with the spirit of the clause. . Such a construction would prevent a State having no local banks from imposing a tax on these shares. And if, as most probably will soon be the case, all the State banks are absorbed by these national banks, or shall go out of existence, will it then be contended that the States must cease to tax these shares because there is no similar stock of State banks to tax? Such a construction would be altogether too literal, and could not have been in the mind of the legislature when the act was adopted. Persons holding these shares are protected by their State governments in the enjoyment of this property, as well as all of their other rights, and no just reason can be perceived why they should, as a class, be privileged from shar-

ing the burdens imposed upon all others for the support of their State government.

Nor can we perceive any force in the argument that, although these shares are not government bonds, exempt from taxation, still they represent such bonds, pledged, by the bank, as a security for the payment of all of its liabilities. The bonds thus pledged belong to the bank, and not to the shareholders. When a shareholder subscribes for stock, he pays his money to the corporation, which, by the law, has become a legal but an incorporeal entity, and the money thus paid becomes the property of the corporation, and when it, with that money, purchases such bonds, they are its property in every sense of that term. And when they are pledged with the proper officer for the payment of the liabilities of the bank, the ownership is not changed. A shareholder has no right, under any circumstances, to withdraw any portion of these bonds thus pledged, but the bank may, in the mode prescribed by the banking law.

It would be more nearly admissible to say, that the circulating notes of the bank, and its certificates of deposit, represent these bonds, than that they are represented by the shares. The former have a prior lien on the bonds, and they are a trust fund created expressly for their redemption. And it has not, we presume, occurred to any one, that the circulating notes in the hands of individuals are exempt from taxation, because they have an ultimate claim on these bonds, if they are not otherwise paid. The certificate of stock entitles its holder to receive any dividend that may be declared, and to share in any assets that may remain after all the liabilities of the bank are canceled; but until then his share gives him no control over the property, or any ownership in it.

Will it be contended, where the shares amount to two or three times as much as the bonds pledged, and the shares are of par value, and the bonds the same, that all of the shares are to be exempted? We can perceive no reason why such is not as reasonable, as when the shares and bonds are equal in amount. It seems to us, that it would be as just and as reasonable to contend, that the real and personal property, and, in a

word, every thing directly or remotely connected with these banks, should be exempt from State taxation as these shares in their capital stock. And we have no hesitation in saying that they are not exempt and are justly, as well as legally, liable to the burden.

When our legislature granted, and the free banks of the State organized under their charters, the corporations thus created became liable to perform all the duties imposed by the law of their existence, and the franchises thus granted to them became vested rights, upon which they could insist, and had the power to enforce. They could not be deprived of them, nor could the legislature change, modify or resume them, until they should be forfeited, or voluntarily surrendered by the corporate body. The granting of the corporate privileges, and their acceptance with the conditions imposed, became a contract between the State and these banks. All the duties which they thus engaged to perform must be held obligatory upon the banks. And to release them from their performance against the will of the State, would be to impair the obligation of the contract, and to violate the decisions of the Supreme Court of the United States referred to above. Any obligations which they have assumed, being in the nature of a contract, cannot be released except by the State.

These banks agreed, when they adopted their charters that the shares of their capital stock should be deemed personal property, and should be liable to taxation by the State. This was their agreement, notwithstanding it had been held in the case of *Weston* v. *The City of Charleston*, 2 Pet. 449, that the bonds issued by the United States government were not the subject of State taxation, and their charters authorized them to file such bonds with the auditor, as a reserved fund to secure their redemption of their circulation. Even if they had considered these bonds as the stock, and the shares as representing it, they had the right to agree with the State to pay a tax on such bonds, as a consideration for the franchises they then received, and that the shareholders did agree to pay the same rate of tax on their shares as should be imposed on other prop-

erty, when they subscribed for their stock, there can be no question.

Nor can they escape the effect of that contract with the State by the banks in which they hold stock substituting government securities, declared to be exempt from taxation, for bonds already filed, which are liable to be assessed and taxed. But, as they have not attempted to do so, there is, therefore, no question on that point. The shares of stock in our State banks must, under their charters, be held liable to taxation, without regard to the character of the bonds they have deposited with the auditor, or of the character of the funds in which their capital or earnings may be invested. If the bonds deposited with the auditor, and the bills received from him for circulation, the net earnings of the banks, their deposits, and all other means at their control, were invested in bonds exempt from taxation, the shares of their capital stock would still be liable to be taxed by the State, because they have so agreed, on a sufficient consideration, and no one can say that such an agreement is not fully authorized.

It then follows that when the shares of the stock of our State banks are taxed on their value, and at the same rate of taxation as that imposed upon the shares of the national banks, both are taxed at the same rate. Under such taxation each pays upon the full amount of the shares in their capital stock, or, rather, it is paid by the shareholders. Thus, it will be seen, that there is, and can be, no discrimination made, unless required by the State laws, and in our State none such do, or ever can, exist, as our Constitution prohibits their enactment, by requiring all taxes to be imposed at an equal rate upon the value of the property taxed. The second proviso, if it were operative, could, therefore, have no effect in this State.

Our banking law, which was adopted in 1851, and under which our banks are organized, by the tenth section, declares that " the shares of said associations shall be deemed personal property, subject to taxation, and shall be transferable on the books of the association, in such manner as may be agreed on in the articles of association. * * * Taxes shall be

levied on and paid by the corporation, and not upon the individual stockholders; the value of the property, to be ascertained annually by the bank commissioners herein provided for; and the rate of taxation shall be the same as that required to be levied on other taxable property by the revenue laws of the State." This section provides, as it will be observed, first, that the shares may be taxed, but indicates no mode in which it shall be done, but leaves it to be effected by the revenue laws. But the second clause of the section requires the property of the bank to be valued by the bank commissioners annually, and taxed at the same rate as other property, and to be assessed to the bank and not to the shareholders.

Under this mode of assessing the shares, it seems to have been found, from experience, that shareholders in these institutions escaped taxation by failing to list their shares, and the State being thus deprived of its revenue, it was supposed that a more certain and efficacious mode should be adopted to prevent the fraud. That the individual shareholders might be reached for taxation, the law was, on the 14th day of February, 1857, amended by the legislature. This is the provision then adopted: "The capital stock of every bank or banking association paid in, or secured to be paid in, except so much thereof as is invested in real estate, which shall be taxed as real estate as herein provided, together with its surplus profits or reserved funds, and also the real estate of every such company, shall be listed by the president or cashier thereof, and assessed and taxed in the same manner as the other personal and real estate of the county, in the town in which such banking association is located." (Scates' Comp. 129, § 6.) This amendment made no substantial change in the mode of taxing the capital of these banks. The original law required the shares to be taxed to the several shareholders, and the amendment requires all of the capital stock to be assessed and taxed to the corporation.

Under the original law, the shares representing the capital stock, when assessed, produced precisely the same result as when the capital stock is taxed. The amount assessed, by either mode, is precisely the same. The shares represent the

capital stock, and the capital stock represents the shares. If listed by the shareholder he would pay the tax directly, and if listed by the bank he would pay the same amount indirectly, as, in that case, the bank would apply for that purpose what would otherwise go to the shareholder as a portion of his dividends on his stock. It only accomplishes the same end in a different mode. It is, in either case, a tax on the shares of the capital stock, and at the same rate.

Thus, it will be seen, that these shares are taxed, and at the same rate as the shares of the banks created by the national banking law. So that, whether the State may exercise the right of taxation, independent of congress, or, under the second proviso in the forty first section of the national banking law, can make no difference under our Constitution and revenue laws, as, in no event, can the shares in our local banks be taxed at a different rate from the shares in the national banks, under existing State legislation. When all of the shares in a national bank are taxed, it can only equal the value of its capital stock, and that is the measure of the amount required to be assessed on the stock of our State banks.

The tenth section of the revenue law of 1853 (Scates' Comp. 1033) declares that " personal property of every description shall be valued at the usual selling price of similar property at the time of listing, and in the county where the same may then be." * * * " Investments in stocks, bonds, joint-stock companies, or otherwise, shall be valued at the true value thereof in money." The term investment in stocks manifestly embraces shares in the capital stock of banks and banking associations. And there can be no question that shares in the capital stock of national banking associations are as fully embraced as others. It would be a perversion of language to hold otherwise. These terms are used in their broadest and most unlimited sense, and without any qualification.

It was not denied that this provision was sufficiently comprehensive to embrace such shares; but it was insisted that, under the provisions of the national banking law, they could only be taxed in the same manner that similar shares in the State banks

are taxed, and, inasmuch as shares in State banks are not taxed, that these shares are exempt. We have seen that the shares of the capital stock of our banks are taxed through the corporation, and the reason, therefore, fails. Had the second proviso of the forty-first section not been inserted, no person would ever have supposed that such shares could not have been assessed and taxes imposed under the existing legislation of our State, as it, in every sense, requires and produces equality in the taxation of the shares of both descriptions of banks, as to valuation and the rate imposed.

It then follows that these shares were liable to be assessed in the mode adopted by the township assessor; and, inasmuch as no question was made as to the value placed upon them, we must conclude that they were not overvalued. And when assessed under our revenue laws, the tax will be at the same rate that is imposed upon other property assessed in the same municipal division in which the shareholders reside. This is required by the Constitution and laws, and the requirement must be observed.

For these reasons, the order of the board of supervisors must be reversed and the cause remanded.

*Judgment reversed.*

Separate opinion by Mr. JUSTICE LAWRENCE:

I concur with my brethren in the decision of this case, and in very much of the reasoning of the chief justice, but not in all the propositions of the foregoing opinion. My concurrence in the decision is based upon the following considerations:

The bonds issued by the general government, are not subject to State taxation. When, however, that government, by an act of congress, offered to the holders of these bonds the privilege of making them the basis of banking, it had the unquestionable right to annex to the exercise of this new and most valuable franchise, such conditions as it thought proper. By the sixty-fifth section of the banking law of 1863, congress expressly reserved the right to amend or repeal the act at its pleasure. By the banking law of June 3, 1864, which repealed

the act of 1863, it is provided in the forty-first section, that the act shall not be construed to prevent the shares of bank stock, created under the act, from being subject to State taxation. This, it is true, is not a grant of power, because, as stated by the chief justice, the power of State taxation is not derived from, and does not depend, upon the federal government. But it is an express relinquishment by the federal government of all claim that this new species of property, thus authorized to be created out of government bonds, should be withdrawn from State taxation on the ground that it was the creation of the federal government. Conceding that the government had the power to exempt this stock from State taxation, yet it explicitly disclaims the intent to do so, and, although the bonds themselves are beyond the power of the States, yet, if the bond holders elect to convert them into bank stock, and thereby come into the exercise of a valuable pecuniary franchise not possessed by them in the character of mere bondholders, they must do so on such conditions as the act giving this privilege imposes. One of these conditions is that the shares of stock shall be subject to State taxation, and these bond holders having chosen to accept and exercise this new franchise, I do not perceive how they can now be permitted to assert that they hold the franchise discharged of its conditions.

As to the question made upon the equality of taxation between the State and national banks, I fully agree with my brethren that this equality, which is secured both by our Constitution and our revenue law, is not affected by the fact that the taxes are assessed against the corporation in the case of State banks, and against the individual stockholders in the case of national banks. The rate of taxation is, in both cases, the same. The difference lies simply in the mode of payment. Under our banking and revenue law a State bank could not escape taxation on its stock by withdrawing its funds from the ordinary investment of commercial paper, and purchasing government bonds. The bonds would not be taxable, but the bank stock would remain taxable as before.

Mr. JUSTICE BREESE: I concur with the chief justice.